# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA

## Alexandria Division

Jesse Hemingway, )
    Plaintiff, )
)
v. ) 1:17cv208 (TSE/MSN)
)
Miss. Chattman, et al., )
    Defendants. )

## MEMORANDUM OPINION

Jesse Hemingway, a federal inmate proceeding pro se, has filed a civil rights action, pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), and the Federal Torts Claim Act ("FTCA"), 28 U.S.C. §§ 2671 et seq. Defendant Dr. DiCocco has filed a Motion for Summary Judgment, as well as a supporting memorandum and exhibits. Dkt. Nos. 73-74. Plaintiff was given the Notice required by Local Rule 7(K) and the opportunity to file responsive materials pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975). Dkt. No. 75. Plaintiff has not filed a response. This motion is now ripe for adjudication. For the reasons that follow, the Motion for Summary Judgment filed by Dr. DiCocco will be granted.

## I. Background

In the operative complaint, plaintiff names the United States of America, HSA E. Chattman, AHSA M. Francos, AHSA Scott-Boston, Dr. M. DiCocco, Dr. Piscitelli, Andarge Yirga, LPN Amber McCaferthy, DNP/FNP Winbush, FNP/MSN T. McClellan, and Dr. K. Prakash as defendants, and raises claims relating to the type of insulin he was provided as well as

the treatment of an injury to his foot which ultimately resulted in the amputation of one of his toes, all while he was incarcerated at FCC Petersburg.[1] The following facts are undisputed.[2]

Plaintiff has been diabetic almost his entire life. Def's. MSJ ¶ 4. During the time in question, plaintiff was incarcerated at FCC Petersburg. Id. ¶ 1. At some point between February and April 2016 plaintiff injured his right great toe. Dkt. No. 43.

Plaintiff's medical records disclose the following:[3]

- In January 2016 plaintiff received his NPH insulin[4] every day except for one morning.[5]

- In February 2016, plaintiff received his morning and evening NPH insulin every day except for three days when he only received his evening NPH insulin.

- On March 1, 2016 plaintiff's HgbA1C was 10.5.[6]

- In March 2016 plaintiff received his NPH insulin every day.

- On April 5, 2016 plaintiff complained that he feet were "burning."

---

[1] Specifically, plaintiff alleges that he was prescribed Neutral Protamine Hagedorn ("NPH") insulin rather than insulin glargine ("Lantus"), even though he told the medical staff at FCC Petersburg that the NPH insulin does not work well with his pancreas. Dkt. No. 43.

[2] The facts set out here are derived from Dr. DiCocco's memorandum of law in support of his Motion for Summary Judgment, as well as from the attached exhibits. As previously stated, plaintiff has not filed any affidavits or declarations in opposition to this Motion for Summary Judgment. See Fed. R. Civ. P. 56. Plaintiff has submitted verified allegations in opposition to a motion filed by defendant United States of America, however, those allegations are not contradicted by the facts set out in this Order.

[3] The following facts are found in Exhibits B and D to Dr. DiCocco's Memorandum in Support of his Motion for Summary Judgement.

[4] Plaintiff only received insulin when he showed up to pill call and did not refuse the insulin injection.

[5] Plaintiff's prescription required that he receive NPH insulin twice a day – once in the morning and once in the evening. Def's MSJ Exs. B, D. NPH insulin can be prescribed by Bureau of Prison ("BOP") staff without further approval. Id. ¶ 8. Lantus cannot be prescribed by BOP staff without higher level approval justifying why the preapproved medication, in this case NPH insulin, was ineffective despite the inmate's compliance with the insulin regimen. Id.

[6] The HgbA1C indicates a person's average blood glucose levels for the past three months. Def's. MSJ ¶ 7. A value of under seven is considered to minimize complications from diabetes. Id.

- On April 26, 2017, plaintiff's HgbA1C was 9.1.

- In April 2016, plaintiff received his NPH insulin all but nine days in the morning. In May 2016, plaintiff only received his NPH insulin eight mornings, however, he received his NPH insulin every evening. Finally, in June 2016, plaintiff only received his NPH insulin one morning, however, he received his NPH insulin every evening except one.

- When Dr. DiCocco examined plaintiff on July 1, 2016, he found no diabetic ulcers on plaintiff's feet but noted that plaintiff's "right great toe has lost most of its sensory supply."

- In July 2016, plaintiff only received his NPH insulin two mornings, however, he received his NPH insulin every evening.

- On August 2, 2016, plaintiff complained that he has been experiencing right great toe numbness for the past month. MLP Yirga noted that plaintiff presented with a callus formation on the tip of his toe without nail discoloration, which he stated was probably from "direct compression of nerve from footwear (institutional boots) and callus." Finally, it was noted that diabetic shoes had already been ordered for plaintiff.

- On August 23, 2016, plaintiff presented with a callus formation on his great right toe without any secondary infection or drainage. MLP Yirga determined it was a callus. An x-ray of plaintiff's right foot taken the same day showed no radiographic evidence for osteomyelitis. Plaintiff's blood tests showed he had normal red and white blood cell counts, however, MLP Yirga prescribed plaintiff antibiotics.

- In August 2016, plaintiff received his NPH insulin 14 mornings and every evening.

3

- On September 6, 2016, plaintiff complained that he had an infection on his right great toe, but that he kept being told by HSA Chatman, AHSA Brown, and MLP Yirga that it was just a callus. Plaintiff asked to be seen by a podiatrist.

- On September 12, 2016, MLP Yirga and Dr. DiCocco examined plaintiff's right great toe. MLP Yirga performed a debridement of plaintiff's great right toe, took a culture of the wound, and prescribed plaintiff antibiotics.

- On September 22, 2016, MLP Yirga informed plaintiff that the culture test results were "no anaerobic growth in 72 hours and aerobic mixed skin flora with multiple negative rods, moderate growth." He told plaintiff to finish his current antibiotics as directed and to control his blood sugar, and then he ordered that plaintiff receive wound care for ten days.

- On September 30, 2016, Dr. Piscitelli prescribed plaintiff oral antibiotics and advised plaintiff that he needed to better control his blood sugar level. He also referred plaintiff to Dr. Prakash, an outside orthopedist, and ordered an x-ray and blood tests.

- In September 2016, plaintiff received his NPH insulin all but 10 mornings, and he received it every evening.

- An October 7, 2016 x-ray of plaintiff's right foot was found to be "stable" when compared to the August 23, 2016 x-ray of plaintiff's right foot.

- On October 7, 2016, plaintiff was seen by Dr. Prakash who recommended removing plaintiff's toe nail.

- On October 26, 2016, MLP Yirga noted minimal drainage from plaintiff's right great toe nail bed and offered to remove the toe nail, but plaintiff stated that he only wanted the specialist to remove the toe nail. Dr. DiCocco approved plaintiff's request.

- On October 28, 2016, offsite provider Nurse Elker, an expert in wound care, reviewed plaintiff's medical records and noted that "ongoing repetitive pressure on the toe, likely related to him walking in his boots, coupled with elevated HgbA1C are of primary concern" with regards to plaintiff's toe ulcer.
- On October 31, 2016, Dr. DiCocco noted that plaintiff needed post-operative shoes.
- In October 2016, plaintiff did not receive his NPH insulin 20 times in the morning and only one time in the evening.
- On November 14, 2016, Nurse Elker reviewed photographs of plaintiff's right great toe and stated that "it is unlikely that the wound is complicated by osteomyelitis" and that he did "not see any signs of an acute soft tissue infection." However, he also stated that there is "evidence of neuropathic injury" that was most likely the result of "improper foot wear." On November 18, 2016, Nurse Winbush noted several recommendations from Nurse Elker, including that plaintiff be provided a wheelchair.
- On November 28, 2016, Dr. DiCocco approved plaintiff for a wheelchair and wheelchair companion "per wound specialist recommendation to have [plaintiff] off his feet."
- On November 30, 2016, an x-ray of plaintiff's right foot was taken because of "infection right great toe diabetic." The radiologist found no radiographic evidence of osteomyelitis. That same day, plaintiff's HgbA1C level was 12.1.
- In November 2016, plaintiff did not receive his NPH insulin 16 mornings but received his NPH insulin every evening.
- On December 2, 2016, Nurse McCafferty noted that plaintiff was noncompliant with the plan of care for his wound.

- On December 5, 2016, Dr. DiCocco noted that plaintiff's "religious practices, such as repeatedly removing bandages multiple times per day and reapplying with his own supply are very likely to compromise and impede wound care and healing."
- On December 26, 2016, Nurse McClellan changed plaintiff's wound dressing and noted "Hyperpigmented nail with hardened callused tissue just beneath nail bed .... No discharge." She also provided plaintiff with ointment to use during dressing changes.
- In December 2016, plaintiff did not receive his NPH insulin 14 times in the morning, but received his NPH insulin every evening.
- On January 24, 2017, Nurse McClellan noted that plaintiff's right great toe was swelling, inflamed, and there was circumferential blistering. She prescribed plaintiff a new antibiotic.
- On February 2, 2017, Nurse Winbush noted that there was necrotic tissue on plaintiff's right great toe that had spread to the nailbed and that there was a one mm open wound and a blister on the plantar toe. That same day plaintiff informed Nurse Winbush that NPH insulin "doesn't work for him."
- On February 8, 2017, plaintiff told Nurse Winbush that he was not taking his NPH insulin in the morning because he was scared to take such a high dose of the NPH insulin. That same day, his HgbA1C was 10.5.
- A February 16, 2017 x-ray of plaintiff's right foot showed no radiographic evidence of osteomyelitis.
- On February 22, 2017, Dr. Rayudu recommended a blood flow test and a PPG of the right great toe.

- On February 24, 2017, Dr. Prakash removed plaintiff's right great toenail and performed a debridement at John Randolph Medical Center ("JRMC").

- On March 19, 2017, Nurse McCafferty provided plaintiff with wound care.

- On March 20, 2017, plaintiff signed a Medical Treatment Refusal form in which he acknowledged that he understood that refusing to take his morning NPH insulin "could result in elevated blood sugar and further complications of health."

- On March 21, 2017, Dr. DiCocco noted that he had "explained to [plaintiff] multiple times that he must improve his diabetic control in order to achieve healing of his toe and any other diabetic ulcers or wounds."

- A March 23, 2017 x-ray of plaintiff's right foot showed "no underlying bony erosive changes to suggest osteomyelitis."

- On March 25, 2017, Nurse McCafferty noted a "[c]ircumferential blister around [the] base of [plaintiff's] right great toe."

- On March 31, 2017, EMT Ramsey noted that plaintiff "has history of 'callus on tip of toe' since as far back as August 2016. It appeared when he returned from surgery the area was improving for few weeks but now has split open again, skin dry and thickening, as well as discoloration." She also noted that plaintiff complained "of burning pain in the area of metatarsal and phalange joint of right great toe" where there was a "small amount of redness ... as well as fine bumps/blister." Finally, she noted that, the day before, she noticed three "laceration type wounds approximately [one] cm each on the bottom side of [plaintiff's] right great toe," which plaintiff stated may have occurred when he was cleaning his cell.

- On April 3, 2017, Nurse Winbush requested that plaintiff be approved for a "tele-wound consult," which was approved by Dr. DiCocco on April 6, 2017. Also on April 6, 2017, Nurse Winbush examined plaintiff's right great toe and noted that there was a blister at the base of the toe and his "capillary refill is sluggish," but there was "no edema in the foot or leg."

- On April 11, 2017, PA-C Hall noted that plaintiff needed another debridement.

- On April 14, 2017, Dr. Prakash debrided plaintiff's right great toe.

- On April 19, 2017, Nurse Winbuch cleaned and dressed plaintiff's great right toe wound.

- On April 22, 2017, EMT Ramsey cleaned and dressed plaintiff's right great toe wound and noted that plaintiff had wounds on his legs, which she addressed. She also cleaned and dressed plaintiff's wounds the next day.

- On April 24, 2017, Nurse Winbush cleaned and dressed plaintiff's right great toe wound, prescribed an antibiotic, and took pictures to send to Nurse Elker.

- On April 26, 2017, Nurse McClellan noted that plaintiff's right great toe wound had necrotic tissues forming and serosanguinous drainage. She cleaned and dressed the wound.

- On April 28, 2017, Dr. DiCocco noted that he had "stressed repeatedly to [plaintiff the] need to control his diet and A1C levels for optimal healing of toes, etc. He also needs to be sure he is not abraiding toes on shoe toe box of his shoes."

- On May 4, 2017, Nurse Elker evaluated pictures of plaintiff and noted "Non-healing ulcer distal right great toe and new fissures on the plantar surface of the toe in the setting of lower extremity neuropathic disease and possibly arterial insufficiency. Screening for underlying osteomyelitis of the right 1rst [sic] toe has been negative. ... There is also

evidence that one barrier to healing may be his adherence to his plan of care as evidenced by his refusal of his morning NPH and his elevated HgbA1C levels. He would also greatly benefit from weight loss and tighter blood glucose control. The record indicates that his health care team has been diligent in his care and follow-up."

- On May 17, 2017, EMT Ramsey cleaned plaintiff's wound, which she found to have a slight smell, likely because it has not been cleaned in two days. EMT Ramsey noted that the smell disappeared after the wound was cleaned. She also noted that the size of the wound bed had "not changed in weeks" and that there was "dry/dead skin building up around the wound, some [of which] was easily flaked off." EMT Ramsey also cleaned plaintiff's wound the next day and she noted "a very faint odor before cleaning, no odor after cleaned."

- On May 21, 2017, Dr. Basker at JRMC examined plaintiff's right great toe and noted that the x-ray showed no definite findings to indicate osteomyelitis.

- On May 21, 2017, plaintiff's HgbA1C was 9.6 and on June 13, 2017, it was 9.4.

- On May 31, 2017, Dr. Rayudu strongly suspected osteomyelitis in the terminal phalanx and recommended an MRI. He also noted that plaintiff may need an amputation of the terminal phalanx of his right great toe.

- On June 14, 2017, Dr. Piscatelli ordered lab tests and an orthopedic consult.

- On June 26, 2017, Dr. Piscitelli noted that plaintiff's right great toe "non-healing ... sore is getting worse, and the whole toe is now slightly cyanotic and painful to the touch."

- On June 28, 2017, plaintiff's HgbA1C was 10.2.

- On June 29, 2017 Dr. Piscitelli noted that plaintiff turned in his walker for a wheelchair and that plaintiff's "[w]ound care of his toe has been an uphill [battle] due to uncontrolled [diabetes] contributing to slow partial healing."
- On June 30, 2017, Dr. Prakash examined plaintiff and noted that plaintiff's diabetes was uncontrolled. He was worried about amputation because plaintiff's post-surgical healing process would be complicated by the uncontrolled diabetes.
- A June 30, 2017 x-ray noted the "possibility of early changes of osteomyelitis of the distal phalanx."
- On July 3, 2017, plaintiff was sent to JRMC because of an infection of his great right toe which needed surgical evaluation and possible amputation.
- On July 5, 2017, plaintiff had an MRI of his right foot done at JRMC which "showed osteomyelitis in the distal phalanx of his great toe." However, there was no suspicion that it had spread to the toe joint or adjacent bone.
- On the weekend of July 8, 2017, plaintiff's great right toe was partially amputated.
- On July 13, 2017, Dr. DiCocco told plaintiff that he needed to comply with taking his NPH insulin twice a day, and that plaintiff was, "at best, only 50% compliant with his insulin AM dosing." Plaintiff told Dr. DiCocco that he believed that, when he took insulin twice per day, his A1C goes up, which Dr. DiCocco noted "is absurd." Finally, Dr. DiCocco told plaintiff that he need not be afraid of large doses of NPH insulin because it is "slow-acting."
- On July 20, 2017, Dr. Prakash evaluated plaintiff's right great toe after the partial amputation.

On October 4, 2016, plaintiff filed a Request for Administrative Remedy in which he complained that his right great toe condition was getting worse and that he wanted to see a podiatrist. Plaintiff's request was denied, and he appealed this decision all the way to the BOP General Counsel's Office.

## II. Standard of Review

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that judgment on the pleadings is appropriate. See Celotex Corp. v. Citrate, 477 U.S. 317, 323 (1986) (moving party bears the burden of persuasion on all relevant issues). To meet that burden, the moving party must demonstrate that no genuine issues of material fact are present for resolution. Id. at 322. Once a moving party has met its burden to show that it is entitled to judgment as a matter of law, the burden then shifts to the non-moving party to point out the specific facts which create disputed factual issues. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, a district court should consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from those facts in favor of that party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Those facts which the moving party bears the burden of proving are facts which are material. "[T]he substantive law will identify which facts are material. Only disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. An issue of material fact is genuine when, "the evidence ... create[s]

[a] fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985). Thus, summary judgment is appropriate only where no material facts are genuinely disputed and the evidence as a whole could not lead a rational fact finder to rule for the non-moving party. Matsushita, 475 U.S. at 587.

### III. Analysis

#### A. Eighth Amendment

Plaintiff alleges that Dr. DiCocco was deliberately indifferent to his serious medical needs because Dr. DiCocco blamed his uncontrolled diabetes for his great right toe injury, prescribed antibiotics that did not work, and did not check to see if his great right toe was infected.

To state a cognizable Eighth Amendment claim for denial of medical care, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Staples v. Va. Dep't of Corr., 904 F. Supp. 487, 492 (E.D. Va. 1995). Specifically, plaintiff must allege two distinct elements to state a claim upon which relief can be granted. First, he must allege a sufficiently serious medical need. See, e.g., Hall v. Holsmith, 340 Fed. Appx. 944, 947 & n.3 (4th Cir. 2009) (holding that flu-like symptoms did not constitute a serious medical need); Cooper v. Dyke, 814 F.2d 941, 945 (4th Cir. 1987) (determining that intense pain from an untreated bullet wound is sufficiently serious); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978) (concluding that the "excruciating pain" of an untreated broken arm is sufficiently serious).

Second, he must allege deliberate indifference to that serious medical need. Under this second prong, an assertion of mere negligence or even malpractice is not sufficient to state an Eighth Amendment violation; instead, plaintiff must allege deliberate indifference "by either

actual intent or reckless disregard." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990) (recognized in Sharpe v. S. Carolina Dep't of Corr., 621 F. App'x 732, 733 (4th Cir. 2015) as overruled on other grounds by Farmer v. Brennan, 511 U.S. 825 (1994)); see also Daniels v. Williams, 474 U.S. 327, 328 (1986). To do so, the prisoner must demonstrate that a defendant's actions were "[s]o grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Id. Significantly, a prisoner's disagreement with medical personnel over the course of his treatment does not make out a cause of action. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).

The undisputed record establishes that plaintiff was treated consistently for his diabetes and great right toe problems from at least July 2016 on. Contrary to plaintiff's allegations, Dr. DiCocco and the other medical staff members took plaintiff's conditions seriously by constantly adjusting his insulin regimen, encouraging plaintiff to comply with his insulin regimen, prescribing antibiotics, performing x-rays to keep track of the potential for osteomyelitis, working with a wound care specialist, requesting outside specialist consultations, and more. While plaintiff ended up having his great right toe partially amputated, it was not because Dr. DiCocco and the rest of the medical staff were deliberately indifferent. Plaintiff may not have agreed with the treatment he was receiving, however, that is insufficient to establish that Dr. DiCocco acted so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. Miltier, 896 F.2d at 851. Therefore, Dr. DiCocco is entitled to summary judgment as to plaintiff's claims of deliberate indifference.

**B. First Amendment**

Plaintiff alleges that Dr. DiCocco refused to provide him medical care in retaliation for being sued in the instant matter. Assuming, without deciding, that plaintiff can being a retaliation claim under Bivens, this claim must be dismissed because it was not administratively exhausted.

Pursuant to the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under . . . any [] Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." See 42 U.S.C. § 1997e(a). The Supreme Court has specifically held that "federal prisoners suing under Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), must first exhaust inmate grievance procedures." Porter v. Nussle, 534 U.S. 516, 524 (2002). Indeed, under the PLRA courts have no authority to waive this exhaustion requirement. See Graham v. Gentry, 413 Fed. App'x 660, 663 (4th Cir. Feb. 18, 2011). Moreover, the PLRA requires "proper" exhaustion, which demands "compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90-91, 93 (2006).

For a federal inmate such as plaintiff, BOP regulations 28 C.F.R. §§ 542.10 et seq. provide a multi-layered exhaustion process. Under BOP regulations, an inmate is first required to attempt to resolve the problem informally, but in the event this fails, the inmate must then file a formal written Administrative Remedy Attempt within twenty days of the incident in question. See 28 C.F.R. § 542.14(a). If the inmate is not satisfied with the response provided, he can appeal the decision first to the warden of the particular facility (Level I), then to the appropriate BOP Regional Director (Level II), and finally to the BOP General Counsel (Level III). See 28 C.F.R. §§ 542.10-542.15.

The undisputed record establishes that plaintiff did not raise any claims of retaliation in the one administrative remedy request that was exhausted. Accordingly, plaintiff's First Amendment claim cannot go forward as it is unexhausted.

## IV. Conclusion

For the reasons stated above, Dr. DiCocco is entitled to summary judgment as to the Bivens claims against him. Accordingly, the Motion for Summary Judgment filed by Dr. DiCocco will be granted by an Order to be issued with this Memorandum Opinion.

Entered this  19  day of  November  2018.

Alexandria, Virginia

/s/
T. S. Ellis, III
United States District Judge